J-S30040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
  :         PENNSYLVANIA
  :
v.   :
  :
  :
  :
CECIL WAYNE JOHNSON   :
  :
Appellant   :    No. 2422 EDA 2021

Appeal from the Judgment of Sentence Entered August 4, 2021
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0001899-2019

BEFORE: STABILE, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED SEPTEMBER 08, 2022**

Cecil Wayne Johnson (Johnson) appeals from the judgment of sentence imposed by the Court of Common Pleas of Lehigh County (trial court) after a jury convicted him of theft by unlawful taking.[1] On appeal, he challenges the sufficiency and weight of the evidence. We affirm.

Johnson was a clerk at a 7-Eleven convenience store that was owned and operated by Barbara Ferguson (Ferguson) and her husband. The trial court summarized the evidence at trial:

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] A person commits the offense of theft "if he unlawfully takes, or exercises unlawful control over, moveable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a). The Crimes Code defines the term "deprive" as "[t]o withhold property of another permanently or ... with intent to restore only upon payment of reward or other compensation." 18 Pa.C.S. § 3901.

[Johnson] was hired as a cashier by the Fergusons, the operators of the 7-Eleven, in January 2018. Until August, when Barbara Ferguson noticed that [Johnson's] registers were "coming up short," [Johnson] was a valued employee. No explanation was forthcoming from [Johnson] about the shortages, so Ms. Ferguson began her own investigation with a review of pertinent videos and an internal audit. [Johnson] can be seen on the videos taking stacks of cash and walking to a back room where there was no video surveillance. His responsibilities included taking money out of the register when the total exceeded one hundred (100) dollars, placing it in an envelope, and then making a simple "safe drop" in a safe that sat next to the cash register. Ms. Ferguson was the only person who had access to the safe. [As she explained at trial:] "[T]he safe is basically a drop box and it has a security code on it, and the only person who had the security code was me, and I was the only person that was able to ... access the safe."

Ms. Ferguson testified that she was tasked with all the daily operations of the store. She worked seven (7) days a week for eleven (11) years at the store. She explained that every sale is recorded, and each employee performs a "close-out" process identifying the money in their register. A cash report is then created, identifying the amount to be deposited in the bank. Any shortages uncovered would fall on the shoulders of the Fergusons to reimburse 7-Eleven.

[Johnson], during the relevant times, August 4, 2018, through October 10, 2018, was a full-time employee. The shortages arose when Ms. Ferguson was unable to supervise the store, as she had done in the past, due to a series of personal tragedies. She described how [Johnson's] safe drops were incorrect, and how [Johnson] was the creator of the information that would be dropped in the safe slot. Ms. Ferguson also explained how her cash reports were prepared. For example, on August 4, 2018, the 7-Eleven had $6,076.00 in cash sales. On that particular day, there was a $100.02 shortage, which could only have come from [Johnson's] shift. She then proceeded to explain the shortages for each of [Johnson's] shifts. She also explained that cents shortages are not unusual, but it is unusual to have dollar shortages. The total shortage was $2,821.00.

Video clips were also presented, documenting [Johnson's] actions during his shifts. For example, on August 4th, [Johnson]

removed money from the twenties slot area in the register. Instead of putting the money in an envelope and then into the safe drop, he proceeded to the back room of the store. On August 27th, he took money from the drawer, went into the back room, and returned without the "stack of money." The back room has a "three sink compartment," but had no functional use for [Johnson]. Once again, it also lacked camera surveillance equipment. When the shortages were discovered, Ms. Ferguson tried to arrange a meeting with [Johnson]. However, [Johnson] never returned to the 7-Eleven for a meeting, or to continue his employment.

Trial Court Opinion (TCO), 1/7/22, at 2-4 (record citations).

Johnson was found guilty of theft by unlawful taking and sentenced to serve 12 months of probation. He filed a timely post-sentence motion raising sufficiency and weight of the evidence claims. After the trial court denied those claims, Johnson filed this appeal again contending that (1) the evidence was insufficient to sustain his theft conviction because there was no direct evidence showing him taking the money, and (2) the verdict was against the weight of the evidence that he took the money.

For his sufficiency challenge, Johnson first focuses on the video surveillance. While conceding that the videos show him taking cash out of the register and going into the backroom, Johnson argues that the videos show nothing more than a breach of protocol, as he is never seen taking the money and putting it in his pocket.

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the Commonwealth presented sufficient evidence that Johnson unlawfully took cash out of the register that was supposed to be

deposited. First, we find no merit in his argument as to the video surveillance showing nothing more than a slight breach of store procedure. At trial, the Commonwealth showed the jury in-store video surveillance from the days that Ferguson's cash reports showed a shortage between cash sales automatically tracked by the register and how much cash was deposited by the clerks. For those days where there were shortages, the videos showed Johnson taking money out of the cash register, walking to the backroom with the cash and then walking back without the cash.[2]

As Ferguson explained, when an employee made a cash deposit into the store's drop-box safe, the store procedure was for the employee to count the cash out next to the register. *See* N.T., 8/3/21, at 92. When asked if there would be any explanation for why Johnson would take the cash into the backroom, Ferguson replied there was nothing in the backroom that would require Johnson to go in there as part of his job. Indeed, she explained that the backroom contained only a sink that was used to wash out the coffee pots and her computer that Johnson was not allowed to use. *Id*. at 128-30. Contrary to Johnson's argument, the jury was not required to ascribe an innocent explanation for his breach of procedure in taking the cash into the

---

[2] *See* N.T., 8/3/21, at 126 (video of August 4, 2018), 132 (August 27, 2018), 134-35 (August 31, 2018), 140 (September 8, 2018), 140-41 (September 9, 2018), 143 (September 12, 2018), 145 (September 16, 2018), 148 (September 17, 2018), 150-51 (September 18, 2018), 155 (September 22, 2018).

backroom for which he would have no reason to use as part of his job duties. The jury was free to infer that Johnson was taking the money into the backroom to count and put in his pocket so as to not been seen by the in-store video surveillance near the register. Accordingly, we find no merit in the first argument of Johnson's sufficiency claim.

In the second part of his sufficiency claim, Johnson argues that the Commonwealth never proved that any of the cash shortages were incurred during his shifts because Ferguson never saved his cash register worksheets that she used for the cash reports. At trial, Ferguson testified that she determined that Johnson was responsible for the shortages because his employee worksheets and cash deposits were short.

> So when -- when an employee leaves work, they have to do a shift close, so that's when that – that employee that's leaving and that employee that is coming is actually sitting there verifying the registers. So they count the registers out together to verify that, you know, the registers are correct.
>
> And then when I come in the next day to do the cash report, I'm taking that information and I'm putting it into the 7-Eleven system, okay, this is how much money they had in their register.
>
> And then the system is automatically – based on the sales of that particular shift, the system is automatically showing like, okay, this employee should have had this much money but instead he had this much money, so this employee is short, you know, X amount of dollars.
>
> So on the days that I was doing the cash report on Cecil's shift, his one particular -- on his particular shift it was showing that, okay, he should have had this amount of money but he had this so he's short this. But then I also was, you know, doing -- writing his -- you know, counting his safe drops, and that's -- his safe

> drops were also short also, which was making his shortages for his shift for that particular day.

*Id*. at 82-83. Later, however, Ferguson admitted that she never saved the employee worksheets that she used at the time to determine that the shortages were attributable to Johnson. *Id*. at 175-77.

While Johnson's point about the lack of employee sheets is well taken, the Commonwealth still presented sufficient evidence to establish that he was responsible for the shortages. First, although it did not present the worksheets, the Commonwealth presented the cash reports for the days when the total cash sales did not match the cash that Ferguson would have to deposit that day. *Id*. at 97-120. In each instance, Ferguson testified that at the time she completed the cash reports, she determined that the shortages were attributable to Johnson's shifts and none of the other employees based on his worksheets.

Thus, the Commonwealth presented (1) documentary evidence to establish the cash shortages, and (2) Ferguson's testimony to establish that Johnson was responsible for the shortages because his worksheets and deposits did not match what his totals should have been. Johnson was free to argue that the jury should disbelieve Ferguson's testimony because she did not save the employee worksheets that she used at the time to determine he was stealing. Whether the cash reports and Ferguson's testimony was enough to establish the theft was a factual question to be resolved by the jury and not by the Court on sufficiency review. In any event, whatever deficiency in proof

that was caused by the failure to present the worksheets was more than made up by the video surveillance showing Johnson taking cash into the backroom on the days of the shortages. For these reasons, we find that Johnson's sufficiency claim fails.

Finally, Johnson also raises a weight of the evidence claim.[3] The trial court addressed this issue in its Pa.R.A.P. 1925(a) opinion:

> The evidence assembled against the appellant was primarily investigated by Ms. Ferguson. She was extremely detail-oriented, and although the evidence may not have been as comprehensive as an experienced fraud investigator, it was not tenuous, vague, or uncertain. Ms. Ferguson's testimony satisfied the jury, and the missing pieces suggested by the appellant do not provide any reason to conclude that the verdict was against the weight of the evidence. It is exclusively for the fact finder to assess the weight to be given to the absence of evidence.

TCO at 8. We would agree with this finding and observe that Johnson developed no real countervailing evidence at trial (1) showing that Ferguson

---

[3] In reaching a verdict, the fact-finder is entitled to weigh the evidence and determine the credibility of the witnesses, and a new trial should not be granted merely because the trial court would have reached a different verdict. *See Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa. Super. 2015). "In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id*. at 546 (citation omitted). However, in considering a motion for a new trial based on the weight of the evidence, the trial court "is under no obligation to view the evidence in the light most favorable to the verdict winner." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Talbert*, *supra*, at 546 (citations omitted).

mistakenly determined the shortages in the cash reports, or (2) explain why he broke protocol and took cash from the register and went into the backroom. In the absence of such evidence, there is no basis to reverse the trial court's determination that the verdict was not against the weight of the evidence.

Judgment of sentence affirmed.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/8/2022*